1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                      FOR THE DISTRICT OF OREGON

9

10  SCOTT R. KIMBALL,                    )
                                         )     No. CV 06-6318-HU
11              Plaintiff,               )
                                         )
12      v.                               )
                                         )  FINDINGS AND RECOMMENDATION
13  MICHAEL J. ASTRUE,                   )
    Commissioner, Social                 )
14  Security Administration,             )
                                         )
15              Defendant.               )
                                         )
16

17  Kathryn Tassinari
    Robert Baron
    Harder, Wells, Baron & Manning
18  474 Willamette Street, Suite 200
    Eugene, Oregon 97401
19      Attorneys for plaintiff

20  Karin J. Immergut
    United States Attorney
21  District of Oregon
    Britannia Hobbs
22  Assistant United States Attorney
    1000 S.W. Third Avenue, Suite 600
23  Portland, Oregon 97204
    Kathryn A. Miller
24  Special Assistant United States Attorney
    Office of the General Counsel
25  Social Security Administration
    701 Fifth Avenue, Suite 2900 M/S 901
26  Seattle, Washington 98104
        Attorneys for defendant

27

28  FINDINGS AND RECOMMENDATION Page 1

HUBEL, Magistrate Judge:

Scott Kimball brought this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his applications for disability benefits under Title II, and Supplemental Security Income (SSI) benefits under Title XVI, of the Social Security Act.

## Procedural Background

Mr. Kimball filed an application for benefits on April 8, 2003, alleging disability since December 1, 1997, from bipolar disorder and post-traumatic stress disorder (PTSD). The applications were denied initially and on reconsideration. A hearing was held on July 19, 2005, before Administrative Law Judge (ALJ) William Philip Horton. On October 25, 2005, the ALJ issued a decision in which he determined that Mr. Kimball's earliest possible onset date under the current application was March 14, 1999. The ALJ found Mr. Kimball not disabled. The Appeals Council denied Mr. Kimball's request for review on October 27, 2006, making the ALJ's decision the Commissioner's final decision.

Mr. Kimball was 39 years old at the time of the ALJ's decision. He has a high school education and two years of college. His past relevant work is as a cabinet-maker, delivery driver and tree trimmer helper.

///

///

FINDINGS AND RECOMMENDATION Page 2

## Medical Evidence

In May 1991, Mr. Kimball was admitted to Bridgewater State Hospital in Massachusetts after being charged with carrying a firearm without a license and disturbing the peace. Tr. 214. Roderick Anscombe, M.D., conducted a court ordered evaluation of Mr. Kimball, and met with him on two occasions, May 3, 1991 and May 16, 1991. Id.

According to Dr. Anscombe's report, on admission, Mr. Kimball was described as grandiose with delusional beliefs and loosely associated thoughts. Tr. 216. His thinking presented as extremely accelerated and his reality testing and judgment were partially impaired. His mood was described as hypomanic. Id. Subsequent to his admission, he showed no further symptoms of mood disorder or psychosis, and was housed on a minimum security unit with no reports of behavior indicating attempts to harm himself or others. Id.

After interviewing Mr. Kimball, Dr. Anscombe concluded that he showed "a long deteriorating course of withdrawal from social contact, increasingly odd ideas, poor work performance in jobs below his previous intellectual capabilities, and episodes of odd behavior which typically precede the onset of schizophrenia." Tr. 219. Dr. Anscombe did not think Mr. Kimball's symptoms reached the level of schizophrenia at that time, and concluded that Mr. Kimball was "best diagnosed as schizotypal personality." Id. Dr. Anscombe thought Mr. Kimball also showed indications of manic depressive illness. Id. At the time of the arrest, Dr. Anscombe thought Mr.

FINDINGS AND RECOMMENDATION Page 3

1 Kimball suffered from the major mental illness of schizophreniform
2 psychosis, a condition which had, by the time of his discharge from
3 the hospital, largely remitted. Tr. 220.

4    Mr. Kimball's medical records resume in 1997. He received
5 treatment at PeaceHealth Medical Group's Mental Health Match in
6 1997 and 1998.

7    On December 3, 1997, Mr. Kimball was given a psychiatric
8 evaluation on referral from his therapist. Tr. 145. Mr. Kimball
9 reported a long term history of mental illness from kindergarten to
10 the present. He described his symptoms as major mood swings, with
11 periods of mania and depression, and "crippling anxiety." Id. Mr.
12 Kimball also reported severe anger and rage though he had not acted
13 on these feelings. He reported extreme suicidal ideation, but no
14 plan. Id. He agreed to accept a trial of lithium and was given a
15 prescription. Tr. 146.

16    A chart note dated March 10, 1998 and signed by Libby
17 Churchill, psychiatric nurse practitioner, relates that Mr. Kimball
18 reported having some toxic symptoms from lithium over the past
19 several weeks and wanting to discontinue the lithium. Tr. 143. Mr.
20 Kimball said he had been attending a bipolar support group and
21 would like a trial of other medications. Id.

22    Mr. Kimball reported that he was still very depressed at
23 times, living "like a hermit" and generally avoiding others. Ms.
24 Churchill observed that Mr. Kimball's speech was rather pressured
25 though he was "less anxious and agitated [than] when he was seen
26 ///

27

28 FINDINGS AND RECOMMENDATION Page 4

1 prior to lithium trial." There was no evidence of psychotic
2 symptoms. Id. Mr. Kimball was started on a trial of Depakote. Id.

3     On March 31, 1998, Ms. Churchill recorded that Mr. Kimball
4 reported tolerating the Depakote very well. Tr. 144. He was still
5 noticing some cycling, but denied side effects and said his sleep
6 was better. He reported a decrease in violent thoughts, but said he
7 was still having difficulty tolerating anxiety when he was in
8 social situations. Id.

9     Mr. Kimball began treatment with William R. Balsom, M.D. on
10 February 17, 1998. Tr. 170. Dr. Balsom noted Mr. Kimball's history
11 of bipolar illness, currently being treated through Lane County
12 Mental Health, and that Mr. Kimball had been on lithium for the
13 past two months as well as other antidepressants which he did not
14 tolerate. Id. Dr. Balsom noted that Mr. Kimball's medical history
15 was "otherwise fairly benign," and treated him for tendinitis, tr.
16 168, and viral gastroenteritis, tr. 169. On February 9, 2001, Mr.
17 Kimball came in for depression, saying he had been off all
18 medications except having recently started thyroid medication. Tr.
19 168. During the previous week had begun to notice that he was
20 sleeping poorly, with anxiety and hypertension symptoms. Id. Dr.
21 Balsom discussed at some length his history of cycles and
22 presentation of manic depression, and decided to restart
23 medication, with Klonopin at bedtime and Depakote. Id.

24     On February 25, 2002, Mr. Kimball reported he was feeling less
25 agitated and anxious on the Depakote, and had had no manic
26 ///

27

28 FINDINGS AND RECOMMENDATION Page 5

1  episodes. Tr. 167. Dr. Balsom thought his bipolar illness was

2  improving on the Depakote. Id.

3      On March 4, 2002, Dr. Balsom wrote that Mr. Kimball continued

4  on the Depakote and Armour thyroid, with the bipolar illness being

5  "improved" on Depakote, but "not optimally." Id. Dr. Balsom

6  increased the Depakote dosage. Id.

7      On March 18, 2002, Mr. Kimball reported having some persistent

8  mild symptoms of mania, resolved when his Depakote dosage was

9  increased. Tr. 166. On July 9, 2002, Dr. Balsom noted that Mr.

10 Kimball was continuing on Levoxyl for hypothyroidism and Depakote.

11 Tr. 165. Mr. Kimball reported that generally his mood was stable,

12 but that he did have occasional episodes of depression, irritability

13 and rage. Id. On August 27, 2002, Dr. Balsom wrote that Mr.

14 Kimball's manic depression was stable on his current dose of

15 Depakote. Tr. 164. Dr. Balsom decreased the dose of Paxil to avoid

16 over-sedation. Id. Dr. Balsom wrote that Mr. Kimball said he was

17 "considering filing for disability," and that Dr. Balsom had

18 "discouraged him from doing this as I think he is able bodied and

19 could work full time if he had the appropriate kind of work." Id.

20     On August 21, 2003, Mr. Kimball was evaluated by H.F.

21 Shellman, Ph.D. Tr. 187. Mr. Kimball was not in counseling at that

22 time, having last received treatment from a private therapist two

23 to three months earlier. Id. Mr. Kimball described a cycle of mood

24 swings involving agitation, confusion and anger. Id. At such times

25 he felt deeply depressed. Id. He said that two to three times a

26 year, he developed mania, but his usual cycle ran from feeling

27

28 FINDINGS AND RECOMMENDATION Page 6

1  normal to depression, with periods of mania becoming less frequent
2  as he got older. Id. He had suicidal ideation. Id.

3      He was currently taking Lamictal, Seroquel, and Clonazepam.
4  Id. Dr. Shellman observed Mr. Kimball's speech to be slightly
5  rapid, but of normal rhythm and without evidence of thought
6  blocking, flight of ideas, tangentiality or circumstantial
7  ideation. Tr. 189. His affect was appropriate to a slightly anxious
8  mood. He denied current hallucinations and delusional ideation. Id.

9      Mr. Kimball related that he had worked part-time doing yard
10 work for the past three years; before that he had worked
11 sporadically as a taxicab driver, for a tree service, doing odd
12 jobs in a bakery, and as a house painter. Id.

13     Mr. Kimball described his mental symptoms to Dr. Shellman as
14 including, among other things, problems at work, depression, loss
15 of appetite, difficulty sleeping, problems with concentration and
16 memory functioning, confusion, quick change of mood, ruminating
17 about problems, problems with breathing, tachycardia, upset
18 stomach, sweating, nightmares, suicidal thoughts, homicidal
19 thoughts, problems controlling anger or urges, feelings of
20 worthlessness, withdrawal from others, anhedonia, and feeling
21 negative about the future. Tr. 190.

22     Dr. Shellman diagnosed Bipolar I Disorder, most recent episode
23 depressed, moderate. Id. In Dr. Shellman's opinion, Mr. Kimball's
24 presentation and demeanor were consistent with the records reviewed
25 and his allegations. Tr. 191. In view of Mr. Kimball's long history
26 ///

27

28 FINDINGS AND RECOMMENDATION Page 7

1  with bipolar disorder, Dr. Shellman considered his prognosis

2  guarded. Id.

3      On September 11, 2003, Dorothy Anderson, Ph.D., a

4  psychologist, did a records review, affirmed by another

5  psychologist, Paul Rethinger, Ph.D., on November 14, 2003. Tr. 193.

6  In her opinion, Mr. Kimball had moderate limitations in several

7  areas, including the ability to understand and remember detailed

8  instructions, maintain attention and concentration for extended

9  periods, work in coordination with others without being distracted

10 by them, interact appropriately with the general public, get along

11 with coworkers, maintain social function, maintain concentration,

12 persistence, or pace, and set realistic goals. Tr. 193-94, 207. Dr.

13 Anderson concluded that Mr. Kimball had the ability to sustain a

14 normal work day and work week, although he was limited to "simple,

15 predictable" tasks, and would function best with only occasional

16 interaction with coworkers and the public. Tr. 195.

17     On June 1, 2004, Mr. Kimball saw Dr. Balsom, after a two-year

18 break in treatment while Mr. Kimball was seeing a naturopath. Tr.

19 222. He was currently on Armour Thyroid and Depakote. Dr. Balsom

20 noted that the previous year, Mr. Kimball had been tried on

21 Remeron, Lamictal and Seroquel without improvement, and with

22 significant adverse reactions. Id.

23     On June 20, 2005, Sandra Kalnins, D.O., a psychiatrist,

24 prepared a summary of her psychiatric treatment of Mr. Kimball. Tr.

25 228. She recorded that Mr. Kimball had been seeing her for several

26 years for treatment of bipolar disorder, having tried both

27

28 FINDINGS AND RECOMMENDATION Page 8

1 prescription and natural mood stabilizers. Dr. Kalnins wrote,

2     Scott has had periods of time when he has fewer mood
3     swings and disturbing thoughts, but has never had
    prolonged relief from these symptoms. He generally has
    shifts between significant depression and higher energy
4     and irritability. He will frequently have violent images
    and thoughts in his head, particularly about people he
5     interacts with. He does not act on these, but these
    experiences make it difficult for him to be around
6     people. Antipsychotic medicines do little to stop these
    experiences. Antidepressant medications have not been
7     helpful.

8 Id. Dr. Kalnins noted that Mr. Kimball had been able to do "limited

9 work," but "only because he has had an unusual amount of

10 flexibility with the jobs." Id. She wrote that Mr. Kimball had done

11 landscaping and yard work "where he has total control over his jobs

12 and hours," and could cancel the work when he had mood or thinking

13 difficulties. Id. He was currently working for a cabinetmaker, and

14 "[s]o far, his boss is extremely flexible with Scott's work hours,

15 but this may not be sustainable over the long term." Id.

16     In Dr. Kalnins's opinion, Mr. Kimball was "totally and

17 permanently psychiatrically disabled." Id. She wrote that because

18 he was "intelligent and resourceful," he appeared "on the surface"

19 to be "much more stable and functional than his chronic mental

20 illness truly allows." Id. In her opinion, Mr. Kimball had been

21 able to "mask much of the mood instability and extremely disturbing

22 thoughts and images." Id.

23     Dr. Kalnins wrote that Mr. Kimball had been "very motivated to

24 try different treatments" for his bipolar disorder, but that none

25 had been consistently helpful. She concluded, "Scott has good

26 coping skills and intelligence, but remains impaired by the Bipolar

27

28 FINDINGS AND RECOMMENDATION Page 9

1  Disorder. I expect him to continue to have difficulties working."
2  Id.

3      On June 21 and June 28, 2005, Mr. Kimball was given a
4  comprehensive psychological evaluation by David R. Truhn. Tr. 229.
5  Dr. Truhn administered the Wechsler Adult Intelligence Scale, Third
6  Edition (WAIS-III), the Minnesota Multiphasic Personality
7  Inventory-II (MMPI-II), and Comprehensive Trail Making Test, as
8  well as conducting a mental status examination, a clinical review,
9  and a records review. Id.

10     Mr. Kimball reported a history of bipolar affective disorder,
11 and said he had been depressed for the last several weeks, with the
12 depression leading to a lack of motivation or interest in
13 accomplishing any tasks or activities, excessive worry and fear,
14 and emotional vulnerability. Id. During major manic episodes, which
15 occurred every two to three years and lasted for months at a time,
16 he had increased energy level, hallucinations and delusions, felt
17 "ridiculously positive," became very creative, and embarked on
18 major projects. During such episodes he felt as if he were a god,
19 and "everything would seem to point to symbols that would ...
20 forecast ... his future." Tr. 230.

21     Mr. Kimball said auditory hallucinations have persisted at
22 times, consisting of voices saying he was crazy when he was
23 depressed. During those times he takes medication, but that the
24 symptoms might last for a week, and then he might not experience
25 them for months at a time. Id. He reported that his last major
26 manic episode had been a few months previously. But when he is in

27

28 FINDINGS AND RECOMMENDATION Page 10

1  a depressive episode, he does not interact with many people and
2  often loses interest in doing things. Id. Mr. Kimball reported that
3  he is angry and irritable most of the time because "I felt so bad
4  about my illness." Id. He experiences increasing worry about day to
5  day activities, where he becomes hot and his heart races for no
6  reason. The episodes occur more than once a week. Id.

7      Mr. Kimball was currently working part-time, as a cabinet-
8  maker, and had done so for the past year. Tr. 231-32. He said he
9  worked about 25 hours a week, averaging five hours a day. Tr. 232.
10 Some days he did not show up for work, and other days he came in
11 late or left early if he was depressed. He characterized his
12 employer as supportive. Id.

13      Mr. Kimball was taking Depakote prescribed by Dr. Kalnins, but
14 said the Depakote managed "the major mania but nothing else." Tr.
15 233. He continues to have breakthrough symptoms, despite the
16 medication. Id. He takes Klonopin and Lorazepam as needed when he
17 feels "volatile [or] hypersensitive," or when he is "overreacting
18 to everything." Id. He tries not to take them because he is
19 concerned about their addictive qualities. Id. Psychometric testing
20 revealed that on the WAIS-III, Mr. Kimball had full scale I.Q. of
21 103, average. Tr. 234. There was significant scatter on the Verbal
22 Sphere and the Performance Sphere, indicating to Dr. Truhn that Mr.
23 Kimball had specific strengths and weaknesses or possible issues in
24 cognitive functioning. Id. He did seem to have a significant
25 weakness in the ability to transcribe written material, but had
26 absolute strengths in general fund of knowledge and long-term
27
28 FINDINGS AND RECOMMENDATION Page 11

memory and abstract reasoning. Id. During the WAIS-III, Mr. Kimball "seemed to have difficulty following simple directions on a test of knowledge and use of vocabulary words." Id. He worked slowly; testing took approximately 25% longer than usual. Id. A fine tremor was noticed in his hand during a test of visuospatial relationships. Tr. 235. He maintained minimal eye contact and his affect was generally flat during the testing. Id.

Neuropsychological screening indicated cognitive deficits. Dr. Truhn thought there was a "strong chance that issues such as a thought disorder had impaired his ability to concentrate during the testing." Id.

Dr. Truhn reviewed both Dr. Kalnins's records and the evaluation done in 1991 by Dr. Anscombe, as well as a newspaper article from the *Gloucester Daily Times* dated April 25, 1991, documenting the criminal incident in Massachusetts. He also reviewed Ms. Churchill's treatment records and the records of Dr. Balsom, as well as the mental status examination by Dr. Shellman. Tr. 236. Dr. Truhn diagnosed Bipolar I affective disorder, most recent episode depressed, moderate; panic disorder with agoraphobia; rule out cognitive disorder; and schizotypal personality disorder. Tr. 237.

Dr. Truhn concluded that the psychometric testing indicated strengths in abstract reasoning, general fund of knowledge and long term memory, but weakness in the area of visual transcription, a subtest that is "often associated with problems in concentration and attention." Tr. 238. The neuropsychological screening test

FINDINGS AND RECOMMENDATION Page 12

seemed to support "problems in concentration and attention, or that there is a possibility of cognitive deficit. It seems most likely at this time that there's a strong possibility that the psychotic symptoms are interfering in his cognitive processing." Id. Dr. Truhn thought the personality inventory seemed to represent his current psychological state, but "possibly with some exaggeration. The symptoms seem to be present and have been providing him with significant difficulty for many years." Id. Dr. Truhn concluded,

> It seems that Mr. Kimball is experiencing symptoms of a severe and persistent mental illness that has been affecting his interactions socially, vocationally, and academically for most of his adult life. It seems that his ability to maintain consistent competitive and employment [sic] is significantly impaired.

Id. Dr. Truhn wrote that Mr. Kimball's prognosis was poor. Id.

Dr. Truhn completed a Mental Residual Function Capacity (MRFC) Report. Tr. 239-40. In his opinion, Mr. Kimball was "markedly limited"[1] in the ability to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision;  and complete a normal workday and workweek without interruption from psychologically based symptoms. Tr. 240. Dr. Truhn found Mr. Kimball moderately limited in several other areas. Id.

///

---

[1] Defined on the form as "A limitation which precludes the ability to perform designated activity on a regular and sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent work schedule." Tr. 239.

FINDINGS AND RECOMMENDATION Page 13

On July 18, 2005, Mr. Kimball's employer, Robert Holvey, the owner of Boston Cabinets, wrote that Mr. Kimball had worked for him since July 13, 2004. Tr. 142. Mr. Holvey wrote that he was "aware of Scott's bi-polar disorder," and because of his disorder, Mr. Holvey had "given him the freedom to come and go as needed." Id. Mr. Kimball was working 20-25 hours a week. Id.

**Hearing Testimony**

Mr. Kimball testified that his mother pays for his medical treatment and for his treatment with Dr. Kalnins. Tr. 262. He said his work history between 1984 and 1999 consisted of a brief period of employment with Sears Roebuck in the shipping department; seasonal work at a ski area directing traffic in a parking lot and shoveling snow; tr. 265; a one-year period in which he sited water lines for the City of Concord, tr. 266; driving a taxi "off and on" for a "few years," tr. 266; working for a temporary service; working as a cashier at a café (a job from which he was fired), tr. 267; house sitting on a farm for six months, tr. 268; ground crew for a tree service, part-time for about six months, tr. 268; and bread delivery three hours a day for about two years, tr. 269. Mr. Kimball said he began working for Boston Cabinets in July 2004, after having done some yard work for the owner. Tr. 273. His job duties include assembling drawers, sanding, puttying, and shop cleanup. Tr. 274. The shop employs only three people, the owner, Mr. Kimball, and another employee who comes in two days a week. Tr. 274.

///

FINDINGS AND RECOMMENDATION Page 14

1    Mr. Kimball said his current employer, Mr. Holvey, had

2 confided to him that he too had experienced depression at times in

3 his life, and that he had been "very helpful with allowing me to

4 take time off when I need or come in late or leave early." Tr. 278.

5 Mr. Kimball said he doubted he could do his job if his employer did

6 not "offer that flexibility." Id.

7    Mr. Kimball said he was currently taking the generic form of

8 Depakote and Clonazepam as necessary for anxiety. Tr. 283. He said

9 he generally takes the Clonazepam about four times a month. Tr.

10 284. He attends a bipolar support group approximately twice a

11 month. Tr. 288. He testified that Depakote helps alleviate the

12 manic symptoms, but does nothing for his depression, anxiety, and

13 agitation. Mr. Kimball said he had tried several other medications,

14 including Risperdal, Zyprexa, Seroquel, and Lamictal, without

15 relief. Tr. 290-91.

16    The ALJ questioned the vocational expert (VE) about a

17 hypothetical individual Mr. Kimball's age, with some college

18 education and with Mr. Kimball's work history, without exertional

19 limitations, but unable to work with the general public. Tr. 296.

20 The VE opined that such an individual could do some of Mr.

21 Kimball's previous jobs, including construction worker, shipping

22 and receiving clerk, tree trimmer helper, woodworker and shop hand,

23 and delivery driver. Tr. 296. The ALJ then asked the VE to consider

24 the additional limitation of being unable to have frequent

25 interaction with co-workers. Tr. 297. The VE opined that such an

26 ///

27

28 FINDINGS AND RECOMMENDATION Page 15

1  individual could still do the same jobs, with the possible
2  exception of delivery driver. Tr. 298.

3      Mr. Kimball's attorney asked the VE to consider whether an
4  individual with the limitations found by Dr. Truhn could perform
5  any of the jobs he cited. Tr. 299. The VE opined that Dr. Truhn's
6  opinion that Mr. Kimball would have difficulty completing a normal
7  workday and work week would rule out competitive employment. Tr.
8  299. The VE thought a person with a marked limitation in the
9  ability to maintain attention and concentration could do some jobs,
10 although probably not the previous employment previously cited. Tr.
11 300.

12     The VE also testified that competitive employment would
13 require absences of no more than two days per month, and breaks of
14 no more than 10-15 minutes two and a half hours into the shift, a
15 lunch break of half an hour to an hour, and another afternoon break
16 two and a half to three hours after the lunch break. Mr. Kimball's
17 attorney asked, "If a person has the freedom to come and go as
18 needed would that be considered an accommodation?" The VE responded
19 that it would be. Tr. 300-301.

20                          **ALJ's Opinion**

21     The ALJ found that Mr. Kimball had been engaged in substantial
22 gainful activity (SGA) for the past year and had continued to
23 engage in SGA through the date of the hearing. Tr. 15. But the ALJ
24 also made a contradictory finding that Mr. Kimball "has not engaged
25 in substantial gainful activity since the alleged onset of
26 disability." Tr. 19. Mr. Kimball's alleged onset of disability is

27
28 FINDINGS AND RECOMMENDATION Page 16

March 14, 1999, the day after he received an unfavorable disability determination. There is no issue of SGA between March 14, 1999, and September 2004, as there is no evidence in the record of SGA for that time period. The court assumes that the ALJ's finding of SGA applies only to the period from September 2004 onward, and not to the period of alleged disability from March 14, 1999 to September 2004.

The ALJ's conclusion that Mr. Kimball had been engaged in SGA since 2004 was based on the evidence that Mr. Kimball earned approximately $1,200 per month. The ALJ noted that under 20 C.F.R. § 404.1574(b)(2) and 416.974(b)(2), average monthly earnings of more than $810 in 2004 and $830 in 2005 "ordinarily indicates that the individual has participated in [SGA]." Tr. 15.

The conclusion that Mr. Kimball was engaged in SGA after September 2004 ended the sequential analysis for that disability period at step one.

The ALJ continued the analysis for step two, presumably for the closed period of March 14, 1999 to September 2004. The ALJ found, at step two, that Mr. Kimball's bipolar disorder was a severe impairment, but accepted the MRFC assessments by psychologists Anderson and Rethinger in 2003 as the "foundation for the claimant's RFC." Tr. 16. Accordingly, the ALJ found that Mr. Kimball's only vocational impairments were limitations on interactions with coworkers and the public. Tr. 17. The ALJ

FINDINGS AND RECOMMENDATION Page 17

1  rejected the more restrictive RFC analysis of Dr. Truhn,[2] finding
2  Dr. Truhn's report unconvincing because it recounted Mr. Kimball's
3  "successful work activity," working an average of five hours a day
4  for 25 hours a week; Mr. Kimball's "friendship with his employer;"
5  Mr. Kimball's "involvement in a relationship with a woman for over
6  four years;" and the belief by Dr. Balsom in 2002 that Mr. Kimball
7  would be able to work full time if he had the "appropriate kind of
8  work." Id. The ALJ found that Dr. Truhn's report "suggests and
9  confirms the claimant's ability to work under appropriate
10 circumstances, as well as some ability to interact appropriately
11 with other people." Id.

12     The ALJ also rejected Dr. Kalnins's opinions that Mr. Kimball
13 was "totally and permanently disabled," and that she expected him
14 "to continue to have difficulties working." The ALJ found that her
15 conclusions were "at odds with reality given that the claimant had
16 been successfully engaging in [SGA] for nearly one year,"[3] and
17 because her report was "merely conclusionary and ... unaccompanied
18 by treatment or clinic notes." Id.

19     The ALJ did not accept Mr. Kimball's testimony because
20 "overall," it did not "substantiate total disability, but only that
21 he has restrictions in the kind of work environment in which he can
22 be successful." Tr. 18. The ALJ noted that by October 1999, Mr.

23

24        [2] Rendered in June 2005, despite the ALJ's earlier
25 determination that Mr. Kimball's disability for the period
   between March 1999 and September 1, 2004 was under consideration.

26        [3] Again, an opinion rendered in June 2005, after the March
27 1999-September 2004 period under consideration for disability.

28 FINDINGS AND RECOMMENDATION Page 18

1  Kimball "reported that he was no longer having mood swings and he
2  felt more in control." Id. The ALJ also noted Dr. Shellman's August
3  2003 report that Mr. Kimball's speech had a normal rhythm, with no
4  evidence of thought blocking, flight of ideas or tangentiality. Id.
5  The ALJ acknowledged that Mr. Kimball had reported increased
6  depression in May 2000, but concluded that "this exacerbation
7  coincided with very difficult financial circumstances; his employer
8  had died." Id.

9      The ALJ found that Mr. Kimball's alleged degree of impairment
10 was inconsistent with his range of activities. The ALJ relied on a
11 chart note dated June 28, 1999 that Mr. Kimball was performing odd
12 jobs, taking a trip to New Hampshire, using the computer, engaging
13 in "mental health chats," and "making friends on the Internet." Tr.
14 18. The ALJ also noted reviewing psychologist Dr. Anderson's
15 observation that Mr. Kimball was able to care for himself, lived
16 with a significant other, able to prepare meals and help with
17 housework, mow the lawn, wash dishes, handle money, shop, garden,
18 watch TV, attend a bipolar support group twice a month, leave home
19 at will, walk, go to the store, drive, and use a phone. Id.

20     The ALJ concluded that Mr. Kimball's symptoms "appear to be
21 generally controlled through the use of medications." Tr. 18. The
22 ALJ cited evidence that when Mr. Kimball restarted Depakote, he was
23 less agitated and less anxious by February 2002, and by August
24 2002, chart notes reflected that his mood had stabilized. Id.

25     The ALJ concluded, on the basis of the VE's testimony, that
26 Mr. Kimball was able to perform work with limited interactions with
27
28 FINDINGS AND RECOMMENDATION Page 19

1 coworkers or the public, and that his past relevant work as a tree

2 trimmer helper and delivery driver satisfied those requirements.

3 Accordingly, the ALJ found that Mr. Kimball was not disabled, again

4 presumably for the closed period of March 14, 1999 to September

5 2004. Tr. 19-20.

6                                 **Standard**

7     The initial burden of proving disability rests on the

8 claimant. <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1432 (9th Cir. 1995).

9 To meet this burden, the claimant must demonstrate an "inability to

10 engage in any substantial gainful activity by reason of any

11 medically determinable physical or mental impairment which ... has

12 lasted or can be expected to last for a continuous period of not

13 less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

14     A physical or mental impairment is "an impairment that results

15 from anatomical, physiological, or psychological abnormalities

16 which are demonstrable by medically acceptable clinical and

17 laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This

18 means an impairment must be medically determinable before it is

19 considered disabling.

20     The Commissioner has established a five-step sequential

21 process for determining whether a person is disabled. <u>Bowen v.</u>

22 <u>Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

23     In step one, the Commissioner determines whether the claimant

24 has engaged in any substantial gainful activity. 20 C.F.R. §§

25 404.1520(b), 416.920(b). If he is, disability benefits are denied.

26 <u>Yuckert</u>, 482 U.S. at 140; 20 C.F.R. §§ 404.1520(b), 416.920(b).

27

28 FINDINGS AND RECOMMENDATION Page 20

If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied.

If the impairment is severe, the evaluation proceeds to the third step. <u>Yuckert</u>, 482 U.S. at 141. In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42.

If the claimant shows an inability to perform his past work,

FINDINGS AND RECOMMENDATION Page 21

1  the burden shifts to the Commissioner to show, in step five, that
2  the claimant has the residual functional capacity to do other
3  available work in consideration of the claimant's age, education
4  and past work experience. Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§
5  404.1520(f), 416.920(f).

**Discussion**

6
7      1.   Is Mr. Kimball engaged in SGA?

8      The ALJ found, at step one of the sequential analysis, that
9  Mr. Kimball was engaged in SGA after September 2004. SGA is work
10 done for pay or profit that involves significant mental or physical
11 activities. 20 C.F.R. § 404.1571-72 & 416.971-75; Lewis v. Apfel,
12 236 F.3d 503, 515 (9th Cir. 2000). Earnings are a presumptive, but
13 not conclusive, sign of whether a job constitutes SGA. Lewis, 236
14 F.3d at 515. Monthly earnings averaging less than $300 generally
15 show that a claimant has not engaged in substantial gainful
16 activity. 20 C.F.R. §§ 404.1574(b)(3), 416.974(b)(3). At the other
17 end of the spectrum, monthly earnings averaging more than $500
18 generally show that a claimant has engaged in substantial gainful
19 activity. 20 C.F.R. §§ 404.1574(b)(2), 416.974(b)(2); Lewis 236
20 F.3d at 515. Mr. Kimball's earnings are high enough to generate a
21 presumption of SGA.

22     But the "mere existence of earnings over the statutory minimum
23 is not dispositive." Keyes v. Sullivan, 894 F.2d 1053, 1056 (9th
24 Cir. 1990). The claimant may rebut a presumption based on earnings
25 with evidence of his "inability to ... perform the job well,
26 without special assistance, or for only brief periods of time." Id.
27 The regulations list the following factors to be considered: the
28 FINDINGS AND RECOMMENDATION Page 22

1  nature of the claimant's work, how well the claimant does the work,
2  if the work is done under special conditions, if the claimant is
3  self-employed, and the amount of time the claimant spends at work.
4  20 C.F.R. §§ 404.1573 & 416.973; *see also* Katz v. Secretary of
5  Health and Human Servs., 972 F.2d 290, 293 (9th Cir. 1992)(citing
6  regulations and listing factors that claimant could use to overcome
7  high-earnings presumption). The regulations specifically provide,
8  as examples of "special conditions," a claimant who is "allowed to
9  work irregular hours or take frequent rest periods," or an employer
10 who exhibits concern for the claimant's welfare. 20 C.F.R. §§
11 404.1573 (c)(2), (c)(6). See also SSR 05-02 (special conditions
12 "may be evidenced in many ways," including being allowed to work
13 irregular hours or granted the opportunity to work, despite
14 claimant's condition, for "altruistic reason.")

15     The question presented by Mr. Kimball's challenge to the ALJ's
16 step one finding that he was engaged in SGA is whether he has
17 overcome the high-earnings presumption to carry his burden of
18 establishing at step one of the sequential analysis that he is not
19 engaged in SGA. The ALJ found that Mr. Kimball works approximately
20 20-25 hours a week, or four to five hours a day. A five-hour work
21 day can support an SGA finding. Keyes, 894 F.2d at 1056.

22     Mr. Kimball has proffered rebuttal evidence on the factors of
23 whether the work is done under special conditions and how well he
24 does the work. The most important evidence is that Mr. Kimball's
25 employer gives him "special consideration in performing his job,"
26 cf. Byington v. Chater, 76 F.3d 246, 250-51 (9th Cir. 1996),
27 including allowing him to limit his work hours and permitting him
28 FINDINGS AND RECOMMENDATION Page 23

1  to come and go apparently at will--the latter a circumstance which,
2  according to the VE's testimony, would be considered an
3  accommodation, rather than a feature of competitive employment. Mr.
4  Holvey has specifically stated that he allows Mr. Kimball to come
5  and go as necessary because of his bi-polar disorder.[4]

6      The ALJ made no reference to Mr. Holvey's evidence, a clear
7  error. See <u>Stout v. Commissioner</u>, 454 F.3d 1050, 1056 (9th Cir.
8  2005)(ALJ erred in failing to address competent lay testimony
9  favorable to the claimant; error not harmless unless court can
10 conclude that no reasonable ALJ, when fully crediting the
11 testimony, could have reached a different disability
12 determination).

13     Other evidence challenging the presumption of SGA is the
14 medical evidence from examining psychologist Truhn and treating
15 physician Kalnins. Dr. Truhn concluded, after reviewing records,
16 conducting a clinical interview, and administering psychological
17 tests, that Mr. Kimball's "ability to maintain consistent
18 competitive and employment [sic] is significantly impaired," and
19 that he had "marked" limitations in the ability to remember and
20 carry out detailed instructions; maintain attention and
21 concentration for extended periods; maintain regular attendance;
22 sustain an ordinary routine without special supervision; and

23

24      [4] I note that the ALJ even made a finding that in May 2000,
25 Mr. Kimball had reported increased depression to his doctor, an
   exacerbation of symptoms that "coincided with very difficult
26 financial circumstances; his employer had died." This finding by
   the ALJ provides evidentiary support for the inference that Mr.
27 Kimball's ability to engage in SGA was dependent on working for a
   particular employer.
28 FINDINGS AND RECOMMENDATION Page 24

complete a normal workday and workweek. Dr. Kalnins concluded, on the basis of a several-year treatment history, that Mr. Kimball had been able to do limited work "only because he has had an unusual amount of flexibility with the jobs."

The ALJ failed to consider the evidence from Mr. Holvey that Mr. Kimball is given special consideration in performing his job. The court cannot weigh the evidence to determine whether the statement of Mr. Holvey, along with the medical evidence from Doctors Truhn and Kalnins, overcomes the earnings presumption. As discussed further below, I conclude that the issue of whether Mr. Kimball was engaged in SGA from September 2004 forward must be remanded to the Commissioner so that the ALJ can make a determination about whether Mr. Kimball has overcome the earnings presumption with this evidence, and is therefore entitled to benefits for the period from September 2004 forward.

Mr. Kimball argues that even if his work at Boston Cabinets were found to be SGA, the ALJ erred in failing to award benefits for a closed period between March 1999 and his employment beginning September 2004. I agree. The following analysis applies to that closed period.

2.   ALJ's rejection of opinions of Dr. Truhn and Dr. Kalnins

Mr. Kimball asserts that the ALJ erred in rejecting the opinions of Doctors Truhn and Kalnins in favor of the opinions of reviewing psychologists Doctors Anderson and Rethinger.

Title II's implementing regulations distinguish among the opinions of three types of physicians: 1) those who treat the claimant, such as Dr. Kalnins and Dr. Balsom; 2) those who examine

FINDINGS AND RECOMMENDATION Page 25

1  but do not treat, such as Dr. Truhn; and 3) those who neither
2  examine nor treat, such as Doctors Anderson and Rethinger. See
3  Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester
4  v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); 20 C.F.R. §
5  404.1527(d). Generally, a treating physician's opinion carries more
6  weight than an examining physician's and an examining physician's
7  opinion carries more weight than a reviewing physician's. Holohan
8  246 F.3d at 1202; Lester, 81 F.3d at 830; 20 C.F.R. § 404.1527(d).
9  In addition, the regulations give more weight to opinions that are
10 explained than to those that are not, Holohan 246 F.2d at 1202, 20
11 C.F.R. § 404.1527(d), and to the opinions of specialists concerning
12 matters relating to their specialty over that of nonspecialists,
13 Holohan, 246 F.3d at 1202, § 404.1527(d)(5).

14      In disability benefits cases, physicians typically provide two
15 types of opinions: medical opinions that speak to the nature and
16 extent of a claimant's limitations, and opinions concerning the
17 ultimate issue of disability, i.e., opinions about whether a
18 claimant is capable of any work, given her or his limitations.
19 Holohan, 246 F.3d at 1202. Under the regulations, if a treating
20 physician's medical opinion is supported by medically acceptable
21 diagnostic techniques and is not inconsistent with other
22 substantial evidence in the record, the treating physician's
23 opinion is given controlling weight. Id.; 20 C.F.R. §
24 404.1527(d)(2); Social Security Ruling (SSR) 96-2p. If the treating
25 physician's medical opinion is contradicted by other substantial
26 evidence in the record, treating source medical opinions are still
27 entitled to deference and must be weighed using all the factors
28 FINDINGS AND RECOMMENDATION Page 26

1  provided in 20 C.F.R. § 404.1527. <u>Id.</u>, citing SSR 96-2p.

2      An ALJ may rely on the medical opinion of a non-treating

3  doctor instead of the contrary opinion of a treating doctor only if

4  the ALJ provides "specific and legitimate" reasons supported by

5  substantial evidence in the record. <u>Id.</u>  In other words, a

6  reviewing physician's opinion may not constitute substantial

7  evidence justifying rejection of a treating or examining

8  physician's opinion unless it is "supported by other evidence of

9  the record and is . . . consistent with it." <u>Lester</u>, 81 F3d at 83;

10 <u>Morgan v. Comm'r</u>, 169 F.3d 595, 600 (9th Cir. 1999).

11     The opinion of reviewing psychologist Dr. Anderson, affirmed

12 by Dr. Rethinger, that Mr. Kimball had no vocational limitations

13 other than on his ability to understand and remember detailed

14 instructions and to interact with coworkers and the general public,

15 is not consistent with other evidence from mental health

16 practitioners. Dr. Shellman opined that Mr. Kimball's demeanor and

17 presentation were consistent with his complaints of, among other

18 things, problems at work, problems with concentration and memory

19 functioning, confusion, quick change of mood, problems controlling

20 anger or urges, feelings of worthlessness, and withdrawal from

21 others. Dr. Kalnins opined in June 2005, based on several years of

22 prior treatment, that Mr. Kimball was "totally and permanently

23 psychiatrically disabled," and would "continue to have difficulties

24 working." Dr. Truhn concluded that Mr. Kimball's psychotic symptoms

25 interfered with cognitive processing and significantly impaired his

26 ability to maintain consistent competitive employment; Dr. Truhn

27 specifically found that Mr. Kimball had marked limitations in the

28 FINDINGS AND RECOMMENDATION Page 27

1   ability to understand and remember detailed instructions, carry out
2   detailed instructions, maintain attention and concentration for
3   extended periods, perform within a schedule, maintain regular
4   attendance, sustain an ordinary routine, and complete a normal
5   workday and workweek.[5]

6       The opinions of Doctors Anderson and Rethinger are
7   inconsistent with other opinion evidence that is entitled to
8   significantly more evidentiary weight. Further, Dr. Truhn's
9   opinions are extensively explained and supported through testing.
10  The opinions of Doctors Anderson and Rethinger are not sufficient
11  to support the ALJ's RFC findings and they do not constitute
12  specific and legitimate reasons for rejecting the opinions of
13  Doctors Kalnins and Truhn.

14      The ALJ's stated reasons for rejecting Dr. Kalnins's opinions
15  were that they were 1) unaccompanied by treatment notes and 2) "at
16  odds with reality, given that the claimant had been successfully
17  engaging in [SGA] for nearly one year."

18      Under the regulations, opinions that are explained are given
19  more weight than those that are not. 20 C.F.R. § 404.1527(d); see
20  also Holohan, 246 F.3d at 1202. But this authority does not mean
21  the ALJ is free to reject Dr. Kalnins's opinions entirely on that
22  basis, particularly since the ALJ rejected them in favor of equally
23  summary opinions from Doctors Anderson and Rethinger.

24      The ALJ's rejection of Dr. Kalnins's report because it was "at
25  odds with reality" is neither specific, nor legitimately based on

26  _____

27      [5] Dr. Truhn's evaluation of Mr. Kimball was done in June
    2005, after Mr. Kimball began working.
28  FINDINGS AND RECOMMENDATION Page 28

substantial evidence in the record. Dr. Kalnins's 2005 letter shows that she was aware Mr. Kimball was at that time working for a cabinetmaker. Nevertheless, Dr. Kalnins discounted Mr. Kimball's ability to do "limited work" on the ground that he was able to do so "only because he has had an unusual amount of flexibility with the jobs," which enabled him not to come to work when he was experiencing mental symptoms. Dr. Kalnins considered the fact that Mr. Kimball was working in arriving at her conclusions; her opinions cannot be rejected on the basis articulated by the ALJ.

The ALJ rejected the RFC findings of Dr. Truhn because 1) Dr. Truhn was aware that Mr. Kimball was working part-time; 2) Mr. Kimball had a friendship with his employer; 3) Mr. Kimball was engaged in a "relationship with a woman;" and 4) Dr. Balsom stated in 2002 that Mr. Kimball could work full time if he had the "appropriate kind of work." These reasons are not sufficient to reject Dr. Truhn's opinions.

I note that according to Dr. Truhn's report, Mr. Kimball stated that he "currently has one friend and that is his employer at his part time job." Tr. 231. Mr. Kimball also said that he and his employer did not socialize outside the work environment. Id. That Mr. Kimball had a friend in his employer is not a sufficient reason to reject a psychologist's opinions on vocational limitations imposed by mental illness; in fact, the friendship between Mr. Kimball and his employer supports the inference that Mr. Kimball's ability to work was dependent upon a sympathetic employer. Mr. Kimball's romantic relationship with a woman is not a sufficient reason to reject Dr. Truhn's opinions on vocational

FINDINGS AND RECOMMENDATION Page 29

1  limitations. The ability to maintain close relationships with
2  family and friends is "not the same as being able to work with
3  people who are less likely to know about or understand [the
4  claimant's] limitations," and thus does not constitute clear and
5  convincing evidence that, contrary to the opinions of his treatment
6  providers, Mr. Kimball could function normally in work and social
7  settings. See <u>Lewis v. Apfel</u>, 236 F.3d 503, 517 (9th Cir. 2001). It
8  should not require stating that to be disabled does not require the
9  claimant to be friendless and without any significant
10 relationships.

11     Dr. Balsom is not a mental health specialist; he is a general
12 medical practitioner. As a non-specialist, Dr. Balsom's opinion
13 about Mr. Kimball's mental limitations is entitled to less weight
14 than those of the mental health specialists. Further, his opinion
15 that Mr. Kimball could work full time if he had the "appropriate
16 kind" of work is too ambiguous to constitute substantial evidence
17 contradicting the opinions of Doctors Kalnins and Truhn that Mr.
18 Kimball could only work when he had an "unusual amount of
19 flexibility," or that Mr. Kimball was unable to maintain regular
20 attendance, sustain an ordinary routine without special
21 supervision, or complete a normal work day and work week without
22 interruption from psychologically based symptoms.

23     The ALJ's rejection of Dr. Truhn's report because it suggested
24 "some ability to interact appropriately with other people"
25 conflicts with the ALJ's own finding, based on Dr. Anderson's
26 records review, that Mr. Kimball was not able to work at jobs that
27 ///
28 FINDINGS AND RECOMMENDATION Page 30

1  required contact with the general public or more than occasional
2  contact with coworkers.

3       The ALJ's reasons for rejecting the opinions of Doctors
4  Kalnins and Truhn are not supported by substantial evidence in the
5  record. Accordingly, the opinions of Doctors Kalnins and Truhn are
6  accepted as true. See <u>Lester</u>, 81 F.3d at 834 (where Commissioner
7  fails to provide adequate reasons for rejecting the opinion of a
8  treating or examining physician, court credits that opinion as a
9  matter of law.); <u>Hammock v. Bowen</u>, 867 F.2d 1209, 1213 (9th Cir.
10 1989).

11      3.   <u>Rejection of Mr. Kimball's testimony</u>

12      The ALJ rejected Mr. Kimball's testimony because 1) "overall,
13 the claimant's testimony does not substantiate total disability,
14 but only that he has restrictions in the kind of work environment
15 in which he can be successful;" 2) in October 1999, Mr. Kimball
16 reported that he was no longer having mood swings and felt more in
17 control; 3) in August 2003, Dr. Shellman wrote that Mr. Kimball's
18 speech had a normal rhythm and there was no evidence of thought
19 blocking, flight of ideas or tangentiality; 4) Mr. Kimball's
20 increased depression in May 2000 "coincided with very difficult
21 financial circumstances; his employer had died;" 5) Mr. Kimball's
22 testimony was inconsistent with his range of activities reported in
23 June 1999, which included the performance of odd jobs, taking a
24 trip to New Hampshire, using the computer, engaging in "mental
25 health chats," and making friends on the internet; 6) his
26 activities of daily living included self-care, preparing meals,
27 helping with housework, mowing the lawn, washing dishes, handling

28 FINDINGS AND RECOMMENDATION Page 31

1  money, shopping, gardening, watching TV, attending a support group
2  twice a month, leaving home at will, fishing, walking, driving, and
3  using the phone; 7) his symptoms were "generally controlled through
4  the use of medications" because after resuming Depakote in February
5  2002 he was "less agitated and less anxious" and a chart note dated
6  August 2002 reflected that his mood had stabilized with the use of
7  Depakote.

8      The ALJ's credibility findings must be supported by specific,
9  cogent reasons. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir.
10 1998). Unless there is affirmative evidence showing that the
11 claimant is malingering, the Commissioner's reasons for rejecting
12 the claimant's testimony must be "clear and convincing." Id. The
13 ALJ must identify what testimony is not credible and what evidence
14 undermines the claimant's complaints. Id. The evidence upon which
15 the ALJ relies must be substantial. Id. at 724. See also Holohan,
16 246 F.3d at 1208. General findings (e.g., "record in general"
17 indicates improvement) are an insufficient basis to support an
18 adverse credibility determination. Reddick 157 F.3d at 722;
19 Holohan, 246 F.3d at 1208.

20     There is no evidence in the record that Mr. Kimball is
21 malingering. I therefore consider whether the ALJ's reasons for
22 rejecting Mr. Kimball's testimony are clear and convincing.

23     One of the ALJ's findings is based on a single chart note from
24 October 1999 in which Mr. Kimball reported he was "no longer having
25 mood swings and ... felt more in control." But a physician's
26 statements must be read in context of the overall diagnostic
27 picture. Holohan, 246 F.3d at 1205. That a single chart note
28 FINDINGS AND RECOMMENDATION Page 32

1  indicates a claimant--whom the ALJ has determined to have bipolar
2  disorder that is severe--has made some improvement does not mean
3  that the claimant's impairments no longer seriously affect his
4  ability to function in a workplace. Id.

5    The same analysis applies to the ALJ's reliance on Dr.
6  Shellman's recorded observation that Mr. Kimball's speech was of
7  normal rhythm without evidence of thought blocking, flight of
8  ideas, tangentiality or circumstantial ideation. This isolated
9  observation, even if it were relevant to the existence or severity
10 of bipolar disorder, does not undermine Mr. Kimball's credibility.
11 Dr. Shellman concluded in the same report that Mr. Kimball's
12 presentation and demeanor were consistent with the medical records
13 and with Mr. Kimball's allegations. Dr. Shellman diagnosed Mr.
14 Kimball with Bipolar I Disorder and gave his prognosis as
15 "guarded."

16   Several of the ALJ's findings are based on activities that are
17 purportedly inconsistent with Mr. Kimball's stated symptoms. Some
18 of these activities are sporadic (performing odd jobs, taking a
19 trip to New Hampshire, attending a bipolar support group twice a
20 month), while others are both sporadic and require little if any
21 personal interaction with others (using the computer, making
22 friends on the internet, watching television). None of these
23 activities is inconsistent with Mr. Kimball's symptoms of
24 depression, anxiety and agitation, and none supports a finding that
25 Mr. Kimball is capable of sustaining competitive employment on a
26 continuous basis.

27 ///

28 FINDINGS AND RECOMMENDATION Page 33

1    The ALJ found that Mr. Kimball's symptoms were "generally"
2  controlled through the use of medications, but cites only the
3  statement by Mr. Kimball that after restarting Depakote in February
4  2002, he was "less agitated and less anxious." This statement does
5  not support a finding that Mr. Kimball's symptoms are controlled
6  through the use of medication, particularly in view of the other
7  evidence in the record that Depakote controls only Mr. Kimball's
8  manic symptoms. See, e.g., Kimball's testimony, tr. 290-91
9  (Depakote helps alleviate manic symptoms but does nothing for
10 depression, anxiety and agitation; other medications, including
11 Risperdal, Zyprexa, Seroquel, and Lamictal ineffective); tr. 228
12 (Dr. Kalnins's statements that none of Mr. Kimball's various
13 treatments had been consistently helpful; that he had "periods of
14 time when he has fewer mood swings and disturbing thoughts," but
15 had never had "prolonged relief from these symptoms;" and that
16 "[a]ntidepressant medications have not been helpful"); tr. 222 (Dr.
17 Balsom's note that Mr. Kimball had been tried on Remeron, Lamictal
18 and Seroquel without improvement, and with significant adverse
19 reactions).

20   As discussed above, the ALJ's finding that Mr. Kimball was
21 depressed in May 2000 because of financial difficulties created by
22 the death of his employer is, if anything, indicative of the
23 validity of Dr. Kalnins's opinion that Mr. Kimball's ability to
24 work was dependent on the flexibility of particular employers. In
25 view of the ALJ's finding that Mr. Kimball was impaired by severe
26 bipolar disorder, Mr. Kimball's statement that his depression was
27 ///

28 FINDINGS AND RECOMMENDATION Page 34

1  made worse by the death of his employer does not disprove Mr.

2  Kimball's symptom testimony.

3      With respect to the ALJ's findings that Mr. Kimball was not

4  credible because his daily activities included self care, meal

5  preparation, helping with housework, mowing the lawn, washing

6  dishes, handling money, shopping, gardening, driving, using the

7  telephone, and walking, the cases caution that disability claimants

8  are not to be penalized for attempting to lead normal lives in the

9  face of their limitations. Reddick v. Chater, 157 F.3d 715, 722 (9th

10  Cir. 1998). A disability claimant need not "vegetate in a dark room

11  excluded from all forms of human and social activity" in order to

12  be deemed eligible for benefits. Cooper v. Bowen, 815 F.2d 557, 561

13  (9th Cir. 1987); Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).

14  Activities that include taking care of oneself, performing

15  household chores, and engaging in hobbies and therapy do not

16  disprove disability. Corrao v. Shalala, 20 F.3d 943 (9th Cir.

17  1994)(as modified on limited grant of rehearing); Ratto v. Secy,

18  839 F. Supp. 1415 (D. Or. 1993). See also Vertigan v. Halter, 260

19  F.3d 1044 (9th Cir. 2001)(rejecting ALJ's credibility findings based

20  on claimant's ability, despite back condition, to go grocery

21  shopping with assistance, walk approximately one hour in malls,

22  swim, watch television, and read).

23      The ALJ's reasons for rejecting Mr. Kimball's testimony are

24  not clear and convincing. I therefore credit the testimony as true.

25  Varney v. Secretary of Health and Human Services, 859 F.2d 1396,

26  1398-99 (9th Cir. 1988); Lester, 81 F.3d at 834(claimant's testimony

27  credited when improperly rejected by ALJ).

28  FINDINGS AND RECOMMENDATION Page 35

1        4.    Remand

2        In Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996), the

3   court held that improperly rejected evidence should be credited and

4   an immediate award of benefits made when: 1) the ALJ has failed to

5   provide legally sufficient reasons for rejecting such evidence, 2)

6   there are no outstanding issues that must be resolved before a

7   determination of disability can be made, and 3) it is clear from

8   the record that the ALJ would be required to find the claimant

9   disabled were such evidence credited. If the Smolen test is

10  satisfied, then remand for payment of benefits is warranted.

11       These three conditions are met with respect to the disability

12  period between March 1999 and September 2004. The opinion testimony

13  of Doctors Kalnins and Truhn, and the testimony of Mr. Kimball, if

14  credited, would require a finding of disability. As for the period

15  from September 2004 forward, remand is necessary so that the ALJ

16  can consider the evidence of Mr. Holvey and determine whether Mr.

17  Kimball has overcome the earnings presumption of SGA.

18                              **Conclusion**

19       I recommend that the Commissioner's decision be reversed and

20  remanded for the payment of benefits for the period March 1999 to

21  September 2004. I recommend that this case be remanded to the

22  Commissioner for further administrative proceedings on the issue of

23  SGA for the period of September 2004 forward.

24                          **Scheduling Order**

25       The above Findings and Recommendation will be referred to a

26  United States District Judge for review. Objections, if any, are

27  due February 28, 2008. If no objections are filed, review of the

28  FINDINGS AND RECOMMENDATION Page 36

1  Findings and Recommendation will go under advisement on that date.

2  If objections are filed, a response to the objections is due March

3  13, 2008, and the review of the Findings and Recommendation will go

4  under advisement with the District Judge on that date.

5

6

7            Dated this <u>13th</u> day of <u>February</u>, 2008.

8

9                                <u>/s/ Dennis James Hubel</u>

10                                   Dennis James Hubel
                                 United States Magistrate Judge
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  FINDINGS AND RECOMMENDATION Page 37